**William NADWORNY,
Petitioner, Appellant,**

v.

**Michael V. FAIR, Respondent, Appellee.**

**No. 88–1844.**

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1989.

Decided April 20, 1989.

Charles M. Burnim, Marblehead, for petitioner, appellant.

Judy G. Zeprun, Asst. Atty. Gen., Criminal Bureau, with whom James M. Shannon, Atty. Gen., Boston, Mass., was on brief, for respondent, appellee.

Before CAMPBELL, Chief Judge, COFFIN and SELYA, Circuit Judges.

SELYA, Circuit Judge.

We revisit today an enduring riddle, now codified: the requirement that a state prisoner who petitions for federal habeas relief must have given the state courts first crack at the claims which he raises.[1] The relative ease with which the requirement can be stated belies the morass of interpretive difficulties which often engulfs individual petitions.

Any reasoned explication of the modern-day state of the law must find its genesis in *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The Court there announced what seemed a straightforward rule: before federal habeas jurisdiction can attach in the ordinary case, "the substance of a federal habeas corpus claim must first be presented to the state courts." *Id.* at 278, 92 S.Ct. at 513. Yet as direct as the *Picard* mandate might appear, it has proven to be elusive in its application. The more simply the guidelines are stated, it seems, the more perplexing the ensuing complications. And as the case before us illustrates, our articulation of the *Picard* principle has perhaps contributed to the surrounding miasma of doubt. We see this appeal as a vehicle for dispelling that uncertainty, at least in part—but we caution the expectant reader that, in this shadowy corner of the law, there is no epiphany. Despite what clarification we may offer, exhaustion determinations of this genre are by their very nature case-specific.

I

We begin by sketching the history of the litigation. The facts, exhaustively set out by the Massachusetts courts, bear no repetition. Sentenced to life imprisonment after his conviction for second degree murder in 1984, petitioner-appellant William Nadworny obtained direct appellate review in the Massachusetts Supreme Judicial Court (SJC), but to no avail; the SJC affirmed his conviction. *Commonwealth v. Nadworny*, 396 Mass. 342, 486 N.E.2d 675 (1985). The United States Supreme Court denied certiorari. 477 U.S. 904, 106 S.Ct. 3274, 91 L.Ed. 2d 564 (1986).

Nadworny then petitioned the United States District Court for the District of Massachusetts for habeas redress. He named as respondent the Commissioner of Corrections (although we treat the Commonwealth as the real party in interest). Nadworny's habeas application contained a half-dozen grounds. The district judge, citing *Rose v. Lundy*, 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982) and *Gagne v. Fair*, 835 F.2d 6, 9 (1st Cir.1987), dismissed the complaint as mixing exhausted and unexhausted claims. *Nadworny v. Fair*, 685 F.Supp. 20, 23 (D.Mass.1988). Three of the claims, the judge wrote, "were not fairly presented to the state courts." *Id.* at 22. Two concerned Nadworny's trial: insufficiency of the evidence and failure to instruct on a lesser included offense (manslaughter). The last concerned his appeal: the SJC's alleged misapprehensions about the requested lesser included offense instruction. Rather than dropping these three claims and proceeding on the remainder, Nadworny appealed the dismissal.

In considering the appeal, we believe it appropriate first to investigate the underpinnings of the Great Writ and the rationale behind the exhaustion doctrine. We then turn to the "fair presentation" requirement and canvass the precedents which assist us in defining it. Next, we spell out what *Picard* exacts. That behind

---

1. The exhaustion provision of the applicable statute provides:

    An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

    28 U.S.C. § 2254(b). The doctrine, in one form or another, has been a part of American habeas jurisprudence at least since the time of the first Justice Harlan. *See Ex parte Royall*, 117 U.S. 241, 250–54, 6 S.Ct. 734, 739–41, 29 L.Ed. 868 (1886).

us, we shine the light of our understanding on the decision below.

## II

Federal habeas is not an ordinary error-correcting writ. The judicial systems of this nation have many-layered, multifaceted instruments to ensure that the intricate procedures of criminal trial and appeal are available to individuals and are properly employed by government actors. Habeas corpus is superimposed on these systems and constitutes an extraordinary remedy, regularly sought but less regularly granted, protecting fundamental federal rights by correcting certain important abuses which everyday legal mechanisms have failed to prevent. *See, e.g., Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 490–91, 93 S.Ct. 1123, 1127–28, 35 L.Ed.2d 443 (1973); *cf. Lefkowitz v. Fair,* 816 F.2d 17, 23–24 (1st Cir.1987). In the course of state criminal proceedings, federal rights are fully cognizable. *See Irvin v. Dowd,* 359 U.S. 394, 404, 79 S.Ct. 825, 831, 3 L.Ed.2d 900 (1959); *Ex parte Royall,* 117 U.S. 241, 251, 6 S.Ct. 734, 740, 29 L.Ed. 868 (1886). Federal habeas exists to rescue those in custody from the failure to apply federal rights, correctly or at all.

The junction where federal habeas power intersects with state criminal processes is enswathed in a mutuality of respect between sovereigns. It is that principle of comity which underlies the federal courts' unwillingness to adjudicate too hastily matters of fundamental federal significance arising out of state prosecutions. *See Castille v. Peoples,* —— U.S. ——, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380 (1989); *Rose v.*

*Lundy,* 455 U.S. 509, 518–20, 102 S.Ct. 1198, 1203–04, 71 L.Ed.2d 379 (1982); *Duckworth v. Serrano,* 454 U.S. 1, 4, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981) (per curiam). Requiring that remedies be exhausted in state courts is merely comity's juridical tool, embodying the federal sovereign's respect for the state courts' capability to adjudicate federal rights. Although the federal courts, other conditions being met, will ultimately salve state error of constitutional dimension, the state must first be accorded the opportunity to protect the federally-assured interests of its criminal defendants.[2]

## III

In this area of federal-state relations, the exhaustion principle is the disputatious sentry which patrols the pathways of comity. A habeas petitioner must have presented both the factual and legal underpinnings of his claim to the state courts in order for us to find it exhausted. *Picard,* 404 U.S. at 276–77, 92 S.Ct. at 512–13; *Martens v. Shannon,* 836 F.2d 715, 717 (1st Cir.1988); *Gagne,* 835 F.2d at 7. The fair presentation of facts has generated little ado. Rather, as a legion of our cases attest, it is the latter prong of the *Picard* postulate— the sufficiency with which the applicant's legal theory was presented—which has much bedeviled courts. *See, e.g., Lanigan v. Maloney,* 853 F.2d 40, 44 (1st Cir.1988); *Mele v. Fitchburg District Court,* 850 F.2d 817, 823 (1st Cir.1988); *Martens,* 836 F.2d at 717; *Gagne,* 835 F.2d at 7; *Dyer v. Ponte,* 749 F.2d 84, 86–87 (1st Cir.1984); *Dougan v. Ponte,* 727 F.2d 199, 200–01 (1st

2. We recognize that the rubric of exhaustion has for decades produced considerable controversy within the political, judicial, and academic communities. At times, each community has displayed mistrust of the states' willingness to respect rights due criminal defendants under federal law; and on occasion, each has urged that federal courts exercise greater supervisory powers over the end results emanating from the state criminal processes. *See generally* Yackle, *The Exhaustion Doctrine in Federal Habeas Corpus: An Argument for a Return to First Principles,* 44 Ohio St.L.J. 393 (1983). Be that as it may, the Court's present-day posture is that, despite this tumultuous history, the state courts

have the obligation, and must be trusted, to take first cognizance of a defendant's claim of federal right. *See, e.g., Rose v. Lundy,* 455 U.S. 509, 518–19, 102 S.Ct. 1198, 1203–04, 71 L.Ed.2d 379 (1982) ("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error."). While exhaustion is not a jurisdictional bar, only in rare cases will federal courts reach an unexhausted claim. *Id.* at 515–16, 102 S.Ct. at 1201–02; *cf. Granberry v. Greer,* 481 U.S. 129, 131–35, 107 S.Ct. 1671, 1673–76, 95 L.Ed.2d 119 (1987).

Cir.1984); *Williams v. Holbrook,* 691 F.2d 3, 6 (1st Cir.1982). Though we believe our search for the legal substance of prior presentment has been relatively consistent, we acknowledge that our post-*Picard* peregrinations have employed a varied vocabulary to describe the applicable standard. In the interests of uniformity, we sense that the time has come to crystallize our meaning.

We are not the first appellate court—and doubtless will not be the last—to attempt to draw the borders of exhaustion more clearly. In *Dougan,* for example, we singled out *Daye v. Attorney General of New York,* 696 F.2d 186 (2d Cir.1982) (en banc), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984), as "a laudable ... effort to give ... specific guidelines" to assist district courts in deciding whether federal claims had been fairly presented. *Dougan,* 727 F.2d at 201. While lauding the Second Circuit's effort, we did not adopt it wholesale. *Compare id. with Daye,* 696 F.2d at 194. We continue to believe that *Daye* provides valuable insights and mechanisms, but we remain wary of transmogrifying our substantive obligation to determine if a claim has been fairly presented into a set of mechanistic tests—especially since those tests were initially designed by the *Daye* court only as *indicia* of fair presentation. The proper search is a search for the heart of the matter, not for ritualistic formality. It was, after all, the *Daye* court itself which cautioned that its criteria meant "in essence, that in state court the nature of presentation of the claim must have been likely to alert the court to the claim's federal nature." *Daye,* 696 F.2d at 192.

■ In partial reliance on *Daye,* and borrowing as we deemed prudent from other authorities, we developed over time a quadripartite set of guidelines. Three aspects are easily explained and, if applicable, easily spotted. If, in state court, a petitioner has 1) cited a specific constitutional provision, 2) relied on federal constitutional precedent, or 3) claimed a determinate right that is constitutionally protected, he will have employed a mechanism which sig-

nificantly eases any doubt that the state courts have been alerted to the federal issue. *Gagne,* 835 F.2d at 7; *Dougan,* 727 F.2d at 201. The only interpretative hazard inherent in these indices appears to be one of specificity. Thus, meeting a guideline must be understood not as the actual embodiment of fair presentation, but only as a possible proxy for it. For that reason, we have held that merely alleging the lack of a fair trial fails the particularity requirement of the third guideline. *Dougan,* 727 F.2d at 201; *see also Gagne,* 835 F.2d at 7 ("oblique" invocation of phrase "due process" not enough); *Dyer,* 749 F.2d at 86–87 ("cursory references" to due process and fourteenth amendment raise doubts about adequacy of presentment). Examples of specificity sufficient to put substantive flesh on the bones of these suggested modalities abound, amply demonstrating the ease with which alert counsel may fulfill the requirements. *See, e.g., Williams,* 691 F.2d at 5–7; *Clay v. Vose,* 599 F.Supp. 1505, 1511–12 (D.Mass.1984).

## IV

■ In *Dougan,* we also mentioned a fourth method by which presentment may be signalled, holding that "a petitioner can successfully claim that he has presented the same legal theory to the state court [if he] present[s] the substance of a federal constitutional claim in such a manner that it 'must have been likely to alert the court to the claim's federal nature.'" 727 F.2d at 201 (quoting *Daye,* 696 F.2d at 192). At first blush, that guideline would appear to do little more than reiterate the primary principle of *Picard. Cf., e.g., Daye,* 696 F.2d at 192. Nevertheless, properly understood, we do not think it merely hortatory. In order to place this guideline into due perspective, we return to its origins.

The Second Circuit recapitulated the teachings of *Picard* in the following fashion:

[T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on perti-

nent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye,* 696 F.2d at 194. We have adopted the first and third of these telltales almost in *haec verba. See, e.g., Dougan,* 727 F.2d at 201. We have not passed upon the second or the fourth, nor have we been understood as adopting them, at least in the stated terms. We do not purpose to do so today. Nonetheless, those two points inform an understanding of the mischievous fourth aspect described in *Dougan.* We explain briefly.

A claim in state court may well present an echo of a federal claim, but one not "likely to alert the court to the claim's federal nature." *Daye,* 696 F.2d at 192. Comity, as we conceive it, would be ill-served if the presentation, while embodying a nascent federal claim, so focused attention on state-law aspects as to mask its federal qualities. Exhaustion necessarily requires "more than scatter[ing] some makeshift needles in the haystack of the state court record ... [;] references which hint that a theory may be lurking in the woodwork will not turn the trick." *Martens,* 836 F.2d at 717. As the Court has decreed, a "constitutional claim [which] inhere[s] in th[e] facts" is insufficient; it must be "brought to the attention of the state courts." *Picard,* 404 U.S. at 277, 92 S.Ct. at 513. The appropriate focus, therefore, centers on the *likelihood* that the presentation in state court alerted that tribunal to the claim's federal quality and approximate contours. The inquiry, in our view, is foremost a question of probability.

When a petitioner has relied on state precedent yet contends that he fairly presented a federal claim, or when he points to a claim that he styles as being "within the mainstream of constitutional litigation," without more, we are less than sanguine that he has "raise[d] the red flag of constitutional breach." *Dougan,* 727

F.2d at 201. *See also Anderson v. Harless,* 459 U.S. 4, 7 n. 3, 103 S.Ct. 276, 278 n. 3, 74 L.Ed.2d 3 (1982) (per curiam) ("We doubt that a defendant's citation to a state-court decision predicated solely on state law ordinarily will be sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the *cited* case advanced a federal claim.") (emphasis in original). Rhetoric arguing that a claim previously asserted without federal citation or other conspicuous federal emblemata nonetheless fell within some hypothetical "mainstream" of constitutional litigation has an oxymoronic quality. Such a boast carries worthwhile cargo only when a local legal culture has adopted a particular idiom for, or formulation of, a federal claim that is consonant with the federal courts' interpretation. That, of course, is a rare bird. We do not declare that such a bareboned presentation will never suffice, but we suggest that it is risky business for counsel to gamble a client's fate on such long odds. At the very least, the burden is on the petitioner to show fair presentation of the claim stateside—and it is a heavy one; a certain grudgingness in accepting conclusory explanations is a necessary concomitant of the judicial task if courts are to make of comity more than an empty gesture. If exhaustion is not to cause future problems, then on these vicissitudinous seas, the more conspicuous the emblemata, the safer.

■ Notwithstanding this monition, when might such a claim be thought "fairly presented" despite the absence of the customary indicia (federal constitutional language, citations, or precedent)? We have acknowledged at least one analogous instance of such an adaptation in Massachusetts, albeit one arising in a somewhat different context. In *Lanigan,* petitioner argued that a lawyer's skeletal objection— "Commonwealth versus Webster in my instructions"—was sufficiently specific to alert the state court to an error steeped in the federal constitutional lore of reasonable doubt. 853 F.2d at 42. Given "that the [SJC] repeatedly has taken pains in recent

opinions to endorse the century-and-a-quarter-old formulation," *id.* at 43, we found that "everyone, including the judge, clearly understood the reference...." *Id.* at 42. Such an objection overcame the argument that the objection placed Lanigan in procedural default. It. also placed the claim within an interpretive state mainstream of federal constitutional law and, obviously, rested entirely on state precedent. In discussing whether the claim itself was exhausted, we noted that "in both state and federal courts [ ] he has argued that the reasonable doubt standard was not adequately conveyed to the jury and that the charge as given therefore trivialized the burden of proof needed to convict." *Id.* at 44. But, while *Lanigan* squeezed through because of the idiocratic features of the case, our decision did not purport to widen the habeas doorway. To the contrary, we continue to believe that, in conventional circumstances, *i.e.*, absent clear and traditional articulation of a claim in language known to preserve a potential federal claim, state-law formulations should most often be construed as raising purely state-law issues. *Cf., e.g., Harless,* 459 U.S. at 7, 103 S.Ct. at 278; *Picard,* 404 U.S. at 277, 92 S.Ct. at 513.

The same sort of process is employed when a habeas applicant has chosen to cite only state cases to state courts in support of a supposedly "federal" claim. The cases themselves are viewed as epiphenomenal; the claim's federal quality is our focus and our concern. We recognize that some suitors may honestly believe that they gain a tactical advantage citing state cases to state courts. But in this context as in others, litigants must bear the foreseeable risks inherent in deliberate stratagems: when available federal cases are shunned, the omission focuses attention on the state-law qualities of the claim and tends to conceal any federal issues which may arguably be at stake. To that extent, proponents of the tactic make the road to habeas relief more difficult for themselves, and likewise increase the chance that state courts will deem any federal issues waived. *See Mele,* 850 F.2d at 821 n. 4; *Dyer,* 749 F.2d at 87 n. 2.

Tactical judgments aside, the fact that a petitioner failed to cite federal cases in the state-court proceedings is sometimes explicable in terms of the development of the caselaw. *See, e.g., Clay,* 599 F.Supp. at 1512 (available federal cases not explicit; state cases cited in lieu thereof referred to federal constitutional law analogies). That use of state-court opinions should not be disfavored; otherwise, we would be denying the capacity of state courts to adjudicate federal issues. The federal courts are not the sole originators of legitimate constitutional interpretation. Justice Brandeis' observation that the states, while not the final determiners of constitutional legitimacy, may serve as laboratories for innovation in social and economic legislation, *Liggett Co. v. Lee,* 288 U.S. 517, 575, 53 S.Ct. 481, 500, 77 L.Ed. 929 (1933) (Brandeis, J., dissenting), also has its more muted echo in constitutional adjudication. Like our sister circuit, we are mindful that one of the ostensible justifications of the exhaustion principle is that it "has the salutary practical effect[ ] of enhancing the familiarity of state courts with federal doctrines...." *Daye,* 696 F.2d at 191. Accordingly, a wooden rule which unfailingly denies exhaustion if no federal cases were cited stateside seems to us too restrictive.

Be that as it may, any lawyer with the capacity to discover a new path in the constitutional thicket is certainly capable, and ought to feel an incumbent duty, to mark that path well enough so that others may follow. In the habeas milieu, this means leaving spoor for the cognoscenti so that a federal habeas court may observe where petitioner's path logically leads—and whether he lighted the way adequately for the state tribunal.

V

■ There is yet another species of exhaustion which merits attention. An individual's claim, arising under and asserted in terms of state law, may, as a practical matter, be indistinguishable from one arising under federal law. If, in fact, the claims are functionally identical—a point of more than trifling concern—we must re-

gard the federal claim as fairly presented. *See Picard*, 404 U.S. at 277, 92 S.Ct. at 513 (where ultimate question for disposition will be the same, the claim is exhausted). But jurisprudential genetics is an uncertain science. Therefore, insofar as the lineage of the claims is at all in question, the petitioner has the burden of demonstrating the clonal relationship of the federal and state claims which would have likely alerted the state tribunal to the federal nuances.

As a rule, identical claims rarely appear; the caselaw in this circuit unmistakably suggests how cabined are the circumstances under which such claims arise. If twins are born at all, the births generally fall into well-defined categories of the criminal law. In *Lanigan*, for example, we agreed that the formulation of an objection to a reasonable doubt instruction presented a federal claim because "[t]he substance of Lanigan's claim has not changed...." 853 F.2d at 44. In *Brown v. Streeter*, 649 F.Supp. 1554 (D.Mass.1986), the court agreed that a challenge to "the validity of identification evidence" was exhausted when a photospread was denominated as "suggestive," notwithstanding that in state court "the substance of [the] objection [was] that the potential suggestiveness of the photo array could not be ascertained by the jury...." *Id.* at 1556–57. In both fora, the legal theory and the facts remained the same; reminiscent of *Picard*, 404 U.S. at 277, 92 S.Ct. at 513, only the formulation of the objection changed. As the district court noted, the SJC's citation to federal cases on point confirmed that the prisoner's presentation in state court alerted the system to his federal claims. *Brown*, 649 F.Supp. at 1557.

A common strand binds these cases together. Each involved bedrock concepts of criminal law. In each, the issues were spelled out with great clarity. In each,

there was little doubt but that a federal issue had been raised, even if in concert with a state issue. In other words, the likelihood that the state tribunal had been made aware of the claim's federal quality was great. But, let us sound a note of caution; it is perilous to generalize too broadly from these decisions. Substantive deviations between superficially similar federal and state claims often exist. State courts are increasingly conscious that state law and the Constitution, though identically or similarly worded, may be differently construed. *See, e.g.*, Wilkins, *Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution*, 14 Suffolk U.L.Rev. 887, 921 (1980). Family resemblances, even fairly striking ones, may not be enough. Where a claim deals in generalities—where it alludes to rights violated under state or federal law, or both, in nonspecific terms—we have been reluctant to find exhaustion. *See, e.g., Dougan*, 727 F.2d at 201.

Problems may also stem from the fact that a state can—and occasionally does—grant an accused greater protection than guaranteed by the federal Constitution. *See* Wilkins, *supra*, at 924–28 (giving examples). In such instances, a federal claim may be embedded in the state claim. For example, a state might require a 12–person jury under all circumstances, though the Constitution does not. A claim that a jury empanelment was "unlawful" would raise the federal issue, and alert the state courts to it, if, and only if, the facts presented limned a constitutional complaint and the language and cases employed spoke to the circumstances of the federal issue. As a result, even where the federal claim is fully included within the state claim, the legal theory of the claims may differ significantly [3]—and if such a lacuna exists, we ought

---

**3.** *Clay* illustrates such a possibility. There, the district court noted that a fair reading of the SJC's affirmance of Clay's conviction, *sub nom. Commonwealth v. Watson*, 388 Mass. 536, 447 N.E.2d 1182 (1983), and the SJC's companion opinion in *Commonwealth v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983), indicated that the state tribunal was imposing constraints on the

use of hypnotically-aided testimony "more severe than those required by federal law." *Clay*, 599 F.Supp. at 1512. While the *Clay* court found that the federal issue had been raised, it is easy to see how a future petitioner might raise a claim implicating state-law constraints on hypnotically-aided testimony which could subsequently be rejected by the Common-

not generally to close that gap. It is for the petitioner to prove that, in spite of the separation, the state courts reached out for, or otherwise became alerted to, the federal issue. Comity considerations, the Court has counselled, render the instances in which we ransack the facts of a state-law complaint in search of an "inhere[nt]" federal claim, few indeed. *Picard*, 404 U.S. at 277, 92 S.Ct. at 513; *see also Harless*, 459 U.S. at 7–8, 103 S.Ct. at 277–78.

## VI

■ To reiterate, the crux of the matter relates to probability. And probability must be reflected not by speculation or surmise, but by trappings—specific constitutional language, constitutional citation, appropriate federal precedent, substantive constitutional analogy, argument with no masking state-law character, and the like—such as would in all likelihood alert a reasonable jurist to the existence of the federal question.

We do not mean to suggest that an isolated federal-law bloom in a garden thick with state-law references will serve. There is more to a petitioner's burden than simply citing a federal case or two. No matter what precedent supports an initiative, the proponent must have presented the federal claim to the state courts unveiled. It is crucial that the state tribunal not be misled concerning the claim's federal character. Above all else, the exhaustion requirement is to be applied with a view to substance rather than form: the claim need not be argued in detail nor separately presented, but its federal quality—demarcated by one of our suggested guidelines or so substantively federal that the prototypical (reasonable) jurist would understand that a federal claim had been presented—must be readily apparent.

## VII

■ Having erected the analytic framework, we turn to Nadworny's application. Despite a moment's ambiguity, *Nadworny*, 685 F.Supp. at 22, the district court recognized that the federal questions had been presented to the state courts, but found it decisive that state precedent had been invoked by petitioner and relied on by the SJC for the rule of decision:[4]

> It is true, as Nadworny claims, that certain of the Massachusetts decisions which he cited to the [SJC] in turn relied on federal precedent interpreting the United States Constitution. But the courts of Massachusetts are fully competent to interpret the federal constitution and, when the highest court of the Commonwealth has done so, that interpretation has precedential force within Massachusetts and is binding on all inferior tribunals in the Commonwealth. By citing solely Massachusetts precedent, Nadworny revealed himself content with the interpretation given by the [SJC] to the federal constitution.

*Id.* at 22–23. This approach misperceived the exhaustion doctrine, for comity, we believe, is a two-way street. It cannot demand that lawyers within a state, having helped to develop a caselaw rich enough to sustain the protection of federal constitutional rights under the state's own precedent, then be prohibited from using that precedent to exhaust a federal constitutional claim. The federal courts could hardly visit a greater insult on a state system of criminal justice.

Here, the SJC did not presume to cast a nonfederal light on the issues petitioner presented. We are not, therefore, dealing with the application of state law *in lieu of*

---

wealth's courts without alerting those courts to an embedded confrontation issue.

4. The district court used a test for exhaustion, citation to federal precedent, that even it suggested was "simplistic." *Nadworny*, 685 F.Supp. at 23 n. 4. We heartily recommend that such citation be employed in appropriate cases because it removes much of the later uncertainty attendant to presentation *vel non* and avoids

problems such as Nadworny brought upon himself. As we warned in *Dyer*, "we think counsel would be well advised ... not to rely on a passing reference to a constitutional provision without supporting federal argument and without citations to federal authorities." 749 F.2d at 87 (footnote omitted). Nevertheless, we decline to accord talismanic effect to the absence of such citation. There is no bright-line test.

federal law. Rather, this is the paradigm case where the state system applied the federal Constitution. *Compare, e.g., Tamapua v. Shimoda,* 796 F.2d 261, 262–63 (9th Cir.1986) (citation to state authority held adequate to give state supreme court full and fair opportunity to address substance of prisoner's sufficiency-of-evidence claim in federal constitutional terms) *with, e.g., Dougan,* 727 F.2d at 201 (citation to state authority which conveys thought that error pursued simply as a matter of state law inadequate fairly to present federal constitutional claim). For these reasons, we believe that the manner of Nadworny's presentation before the SJC yielded federal claims; he met the bare minimum required to create "a constitutional frame of reference." *Gagne,* 835 F.2d at 8.

## VIII

█ The rest follows inexorably. After all, in the instant case, the same facts and legal theories were advanced before the state and federal tribunals. As the Commonwealth admitted both in its brief and at oral argument before us, the test for reviewing sufficiency of the evidence is essentially identical under state law as under the Constitution. The genealogy of the state caselaw renders that fact doubly clear. The Commonwealth does not allege that Nadworny advanced any new factual allegations in the district court. The confluence of these factors lifts petitioner over the jurisdictional bar; the equivalency in presentation was enough to meet our "face-up and squarely" test. *Martens,* 836 F.2d at 717.[5]

█ Beyond Nadworny's sufficiency-of-the-evidence claim, the district court also termed two more grounds in the application unexhausted. These claims dealt with the constitutional requirement that the jury be instructed on lesser included offenses. Nadworny contends that they are "indistinguishable as a matter of substance...." Petitioner's Brief at 25. The Common-

wealth seemingly agrees; it treated the two claims as one in its brief, and made no attempt to differentiate between them at oral argument. Taking our lead from the parties, we therefore integrate these two claims for purposes of the ensuing discussion. *Cf. Williams,* 691 F.2d at 7 ("specific claims [can] incorporate the general claims").

Petitioner argues that his lesser included offense claim has been exhausted. Our job is not to analyze the grounds on which the Commonwealth's courts decided the issue, *Dyer,* 749 F.2d at 86 n. 1, but to ask if the claim is properly raised by federal habeas, and if so, whether the state courts were likely alerted to its federal nature. First, we take note that the facts which underbrace the claim federally are the same as were presented to the state courts. Our inquiry next shifts from facts to theory. Although the precedent which petitioner cited differed somewhat between court systems, we believe that such modest variation is an insufficient distinction. *See, e.g., Harris v. Scully,* 779 F.2d 875, 878 (2d Cir.1985) (fact that habeas petitioner cited authorities in federal court different from those cited in state court not determinative of exhaustion analysis). On the whole, the legal theory espoused in state court, and federally, was fundamentally equivalent. Indeed, the Commonwealth does not claim otherwise; it argues only that, "[f]or all that appears from the cases he cited in his [state court] brief, Nadworny's position was that, under state law, the trial judge must instruct on the lesser included offense of manslaughter if any view of the evidence would permit a finding of manslaughter." Respondent's Brief at 8. Finally, the essence of the claim—that reasonable doubt exists as to guilt on the crime charged—is a matter of fundamental due process, *see In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *Mullaney v. Wilbur,* 421 U.S. 684, 697–98, 95 S.Ct. 1881, 1888–89, 44

---

**5.** To be sure, the district court may not have been much assisted by the phraseology set forth in *Martens.* We intended that terminology to be merely a personalized iteration of an unchanged requirement. Whatever nuances of difference may be spun out by the legists, the articulation altered nothing of substance.

L.Ed.2d 508 (1975), and therefore cognizable in a federal habeas proceeding.

The only inquiry that remains, then, is whether the claim as framed on direct appeal likely alerted the state courts that a federal question was being presented. To be sure, the call is close. On the one hand, no federal cases or constitutional provisions were cited at the state level. On the other hand, the state courts applied federal law as developed under Massachusetts precedent. The parallel phrasing of the right at issue, as explained, respectively, in *Mullaney*, 421 U.S. at 697–98 & n. 23, 95 S.Ct. at 1888–89 & n. 23 ("absence of the heat of passion on sudden provocation"), and in *Commonwealth v. Nieves*, 394 Mass. 355, 359–60, 476 N.E.2d 179, 182 (1985) ("absence of the heat of passion on sudden provocation") (citing *Mullaney*), is striking. The parallelism was highlighted by Nadworny's brief to the SJC, which adopted the *Nieves* language word for word. Citing *Nieves*, he argued that the trial judge should have instructed the jury concerning the Commonwealth's obligation to prove the "absence of heat of passion beyond a reasonable doubt." At the least, then, petitioner met our guideline that he must openly pin his hopes to "a particular right specifically protected by the Constitution." *Dougan*, 727 F.2d at 201 (quoting *Daye*, 696 F.2d at 193).

Even so, petitioner's presentation might well have been insufficient to alert the state court, were there not mitigating factors, such as the clarity and obvious relevance of the *Nieves* citation. We think it reasonably plain on this record that citations to *Nieves* played "a prominent part in the state court argument," *Dougan*, 727 F.2d at 202, and served to augment Nadworny's presentation of the substance of his federal claim. That the references were few in number is not determinative; the prominence of the point was apparent. What counts is not the quantity of the citations but their quality, taken in context.

To frost the cake, as it were, we find nothing to suggest that the presentation in state court somehow masked the potential federal issue. While the SJC addressed the issue on its own terms, the conspicuous relevance of the federal issue, even when considering the charge as a whole, *Nadworny*, 396 Mass. at 360–61, 486 N.E.2d at 686, was apparent. We see no reason to believe that the state judges had "to ferret out ... evanescent needle[s] from outsized paper haystack[s]." *Mele*, 850 F.2d at 822 (quoting *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988)).

In sum, reasonable jurists would likely have been alerted to the federal nature of the claim, given the notability of the *Nieves* point, as argued, and the nature and genesis of the Commonwealth's own constitutional jurisprudence. It would severely undermine comity for us not only to assert that the SJC cannot be understood to have applied federal law, but that, if they did so, they managed the chore while swimming deaf and blind in a sea of their own creation.

## IX

We need go no further.[6] Of the six grounds alleged in Nadworny's petition, three are not before us, and we take no view of exhaustion relative thereto. The district judge found the other three unexhausted. 685 F.Supp. at 22. We disagree. For the reasons set forth above, it is our opinion that Nadworny "fairly presented" these claims in the state system and thus, sufficiently exhausted them. The court below should have entertained the habeas application on the merits.

*The judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion. Costs in favor of petitioner.*

---

6. Despite respondent's arguments to the contrary, we do not believe that this appeal requires us to treat with the issue of procedural default. *See Mele*, 850 F.2d at 822. That question was for the state courts to resolve. *Ulster County*

*Court v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979); *Mele*, 850 F.2d at 822; *Puleio v. Vose*, 830 F.2d 1197, 1201 (1st Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1297, 99 L.Ed.2d 506 (1988).