USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-2057 RYAN ALLEN, Petitioner, Appellant, v. ATTORNEY GENERAL OF THE STATE OF MAINE, Respondent, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ _________________________ Before Torruella, Chief Judge, ___________ Aldrich, Senior Circuit Judge, ____________________ and Selya, Circuit Judge. _____________ _________________________ Wayne R. Foote, with whom Foote & Temple was on brief, for _______________ _______________ appellant. Joseph A. Wannemacher, Assistant Attorney General, with whom _____________________ Andrew Ketterer, Attorney General, was on brief, for appellee. _______________ _________________________ March 26, 1996 _________________________ SELYA, Circuit Judge. Invoking federal habeas corpus SELYA, Circuit Judge. ______________ jurisdiction, petitioner-appellant Ryan Allen seeks to block the State of Maine from prosecuting him for operating a motor vehicle under the influence of alcohol (OUI) in violation of 29 M.R.S.A. 1312-B (West Supp. 1994).1 He insists that continued prosecution of this charge will transgress the Double Jeopardy Clause. See U.S. Const. amend. V. Because the petitioner's ___ arguments, though ingenious, are without intrinsic merit, we affirm the district court's dismissal of his habeas petition. I I On December 11, 1994, a state trooper arrested Allen for committing an OUI offense. The State preferred charges against him. As directed by law, the Secretary of State (the Secretary) then suspended Allen's driver's license for ninety days. See 29 M.R.S.A. 1311-A, reprinted in the appendix. ___ It is said that every action produces an equal and opposite reaction. Having felt the lash of the administrative suspension, the petitioner moved to dismiss the pending criminal charge on double jeopardy grounds. The nisi prius court denied the motion, relying upon an opinion issued by Maine's highest  ____________________ 1The state legislature recently repealed, substantially reenacted, and recodified the statutes in question. See, e.g., ___ ____ 29-A M.R.S.A. 2411 (West Supp. 1995) (providing criminal penalties for OUI); id. 2451 (providing for administrative ___ suspension of driver's licenses following OUI arrests); id.  ___ 2403 (ensuring credit for an administrative suspension if a suspension is later ordered as part of a corresponding criminal sentence). Because all the relevant events took place under the previous regime, we cite exclusively to the 1994 version of the statutory scheme. 2 tribunal (the Law Court) two months earlier. See State v. ___ _____ Savard, 659 A.2d 1265, 1268 (Me. 1995) (holding in materially ______ identical circumstances that an administrative license suspension did not constitute punishment for double jeopardy purposes). Instead of appealing the ruling to the Law Court, the petitioner (who had been released on bail and was, therefore, technically in the state's custody, see Lefkowitz v. Fair, 816 F.2d 17, 22 (1st ___ _________ ____ Cir. 1987)), applied for a writ of habeas corpus in the United States District Court for the District of Maine. The federal district court consolidated this petition with a petition brought by Lori Thompson (a similarly situated individual). After due consideration, Judge Brody concluded that the license suspension and indictment arose from the same offense and constituted separate proceedings,2 but that there could be no multiple punishment (and, hence, no double jeopardy) because the administrative sanction served remedial, rather than punitive, ends. See Thompson v. Maine Atty. Gen., 896 F. Supp. ___ ________ ________________ 220, 221-22 (D. Me. 1995) (explaining that the suspension provision "is designed primarily to ensure the public safety of drivers in Maine"). Accordingly, Judge Brody dismissed both habeas petitions. See id. at 223. This appeal ensued. ___ ___ II II Before turning to the merits of the double jeopardy claim, we discuss two potential procedural obstacles.  ____________________ 2The State does not challenge either of these determinations on appeal. 3 A. A. __ The first procedural hurdle is easily vaulted. Ordinarily, a state criminal case is ripe for the ministrations of a federal habeas court only after completion of the state proceedings (that is, after the defendant has been tried, convicted, sentenced, and has pursued available direct appeals). See, e.g., Fay v. Noia, 372 U.S. 391, 418 (1963); Nadworny v. ___ ____ ___ ____ ________ Fair, 872 F.2d 1093, 1096 (1st Cir. 1989). In this instance, the ____ petitioner knocked on the federal court's door before his state trial began. But because of an exception to the ripeness rule, this case evades the bar. A petition for habeas relief that raises a colorable claim of former jeopardy need not invariably await trial and conviction in the state court. Such claims are distinctive because the Constitution insists that "courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial." Witte v. United States, 115 S. Ct. 2199, 2205 (1995) _____ _____________ (quoting Brown v. Ohio, 432 U.S. 161, 165 (1977)). To realize _____ ____ the solemn promise of this constitutional guaranty, federal habeas courts will in appropriate circumstances entertain a claim that permitting a nascent (but as yet incomplete) state court prosecution to go forward would violate the Double Jeopardy Clause. See, e.g., Justices of Boston Mun. Court v. Lydon, 466 ___ ____ ______________________________ _____ U.S. 294, 302-03 (1984) (plurality op.); Gilliam v. Foster, 75 _______ ______ F.3d 881, 904 (4th Cir. 1996); Mannes v. Gillespie, 967 F.2d ______ _________ 4 1310, 1312 (9th Cir. 1992), cert. denied, 506 U.S. 1048 (1993). _____ ______ This is a nearly classic case for invoking the exception.3 Thus, we hold that the petitioner may seek federal habeas corpus relief without first undergoing trial on the challenged indictment. B. B. __ The second procedural hurdle results from the petitioner's bypassing of the Law Court en route to a federal forum. This shortcut flouts the general rule that a petitioner must exhaust all available state remedies before federal habeas jurisdiction attaches. See, e.g., Scarpa v. DuBois, 38 F.3d 1, 6 ___ ____ ______ ______ (1st Cir. 1994), cert. denied, 115 S. Ct. 940 (1995); Nadworny, _____ ______ ________ 872 F.2d at 1096-97; see generally 28 U.S.C. 2254(b). We think ___ _________ that the shortcut is permissible in this case. Although the exhaustion rule is important, it is not immutable: exhaustion of remedies is not a jurisdictional prerequisite to a habeas petition, but, rather, a gatekeeping provision rooted in concepts of federalism and comity. See ___ Nadworny, 872 F.2d at 1096 ("Requiring that remedies be exhausted ________ in state courts is merely comity's juridical tool, embodying the  ____________________ 3There are three general classes of double jeopardy claims. See United States v. Rivera-Martinez, 931 F.2d 148, 152 (1st ___ _____________ _______________ Cir.) (explaining that the Double Jeopardy Clause "safeguards an individual against (1) a second prosecution for the same offense, following an acquittal; (2) a second prosecution for the same offense, following a conviction; and (3) multiple punishments"), cert. denied, 502 U.S. 862 (1991). While immediate recourse to _____ ______ federal habeas most commonly occurs in successive prosecution cases, we see no reason why such recourse is not equally propitious in a multiple punishments case where, as here, the alleged punishments have their origins in separate proceedings. 5 federal sovereign's respect for the state courts' capability to adjudicate federal rights."). Consistent with this rationale, the federal courts have carved a narrow futility exception to the exhaustion principle. If stare decisis looms, that is, if a _____ _______ state's highest court has ruled unfavorably on a claim involving facts and issues materially identical to those undergirding a federal habeas petition and there is no plausible reason to believe that a replay will persuade the court to reverse its field, then the state judicial process becomes ineffective as a means of protecting the petitioner's rights. In such circumstances, the federal courts may choose to relieve the petitioner of the obligation to pursue available state appellate remedies as a condition precedent to seeking a federal anodyne. See Piercy v. Black, 801 F.2d 1075, 1077-78 (8th Cir. 1986); ___ ______ _____ Robinson v. Berman, 594 F.2d 1, 3 (1st Cir. 1979). The law, ________ ______ after all, should not require litigants to engage in empty gestures or to perform obviously futile acts. Here, Judge Brody recognized that the Law Court's very recent decision in Savard propelled this case within the ______ perimeter of the futility exception to the exhaustion rule. Thus, the judge determined that it would be bootless for the petitioner to invite state appellate review and excused him from doing so. See Thompson, 896 F. Supp. at 221. Because the ___ ________ finding of futility cannot be faulted, we uphold the court's decision to allow the habeas case to proceed. III III 6 Turning to the merits of the controversy, we borrow heavily from our decision in United States v. Stoller, ___ F.3d _____________ _______ ___ (1st Cir. 1996) [No. 95-2175]. Stoller involved a challenge, _______ on double jeopardy grounds, to a criminal prosecution for misapplication of bank funds following the imposition of an administrative sanction (a debarment order precluding Stoller from employment or other participation in the banking industry). See id. at ___ [slip op. at 2-3]. In addressing Stoller's ___ ___ challenge, we delineated the analytic framework that governs a court's appraisal of most civil sanctions that are alleged to be disguised punishments.4 We explained that, in such cases, courts must examine "the totality of the circumstances, including the source of the authority under which the [civil sanction] is imposable, the goals underpinning the authorizing statute, the order itself, the purposes it serves, and the circumstances attendant to its promulgation." Id. at ___ [slip op. at 21]. If ___ this holistic examination indicates that the sanction is better characterized as remedial rather than as punitive, it will not be deemed to constitute punishment for double jeopardy purposes. See id. at ___ [slip op. at 7]. ___ ___  ____________________ 4A different framework governs a court's appraisal of "monetary penalties designed to make the sovereign whole for harm or loss that is quantifiable in actual or approximate monetary terms." Stoller, ___ F.3d at ___ [slip op. at 12]. In those _______ cases, the proper test requires a determination of whether the sanction can fairly be seen as remedial (and, hence, nonpunitive), or whether it is only explicable in deterrent or retributive terms (and, hence, punitive). See United States v. ___ _____________ Halper, 490 U.S. 435, 448-49 (1989); Stoller, ___ F.3d at ___ ______ _______ [slip op. at 12-13]. 7 A. A. __ The first step a court must take in assessing the aggregate circumstances is to inspect the statute under which the sanction has been imposed. See id. at ___ [slip op. at 21]. In ___ ___ this instance the statute, 29 M.R.S.A. 1311-A, contains a statement of purpose that simplifies the judicial task. The proviso serves to safeguard travelers on the state's roads, see ___ 29 M.R.S.A. 1311-A(1)(A), by "remov[ing] quickly from the public highways . . . those persons who have shown themselves to be a safety hazard by operating or attempting to operate" motor vehicles after imbibing quantities of alcohol, id. 1311- ___ A(1)(B). So viewed, the license suspension proviso furthers a quintessentially remedial goal (public safety) and it is, therefore, not punitive in the relevant constitutional sense. Accord State v. Hickam, 668 A.2d 1321, 1328 (Conn. 1995) (finding ______ _____ ______ similar statutory scheme to be remedial in nature); Savard, 659 ______ A.2d at 1268 (finding 29 M.R.S.A. 1311-A to be remedial in nature). The petitioner does not dispute that public safety is both the driving force behind the statute and a legitimate area of legislative concern. Still, he attempts a flanking maneuver. This statute, he argues, must have a punitive aim because the suspension period increases with the number of violations. See ___ 29 M.R.S.A. 1311-A(5)(B), 1312-B(2). The argument is unconvincing. While tying the severity of a penalty to the number of 8 offenses perpetrated may indicate a retributive intent, such a linkage may also indicate a protective intent. Here, for example, the escalating suspensions plainly reflect, at least in part, a desire to safeguard the public by ousting those who, on average, present the greatest safety hazard recidivist drunk drivers from the highways for longer periods of time. Given this perspective, we believe that the escalating length of the authorized administrative suspensions is not so clearly punitive as to require us to characterize the statute as penal in nature. See, e.g., Bae v. Shalala, 44 F.3d 489, 495 (7th Cir. 1994) ___ ____ ___ _______ (explaining that "the duration or severity of [a civil sanction] will not mark it as punishment where it is intended to further a legitimate governmental purpose"). B. B. __ We turn next to the design and structure of Maine's statutory scheme. Pointing out that a driver loses his license under 29 M.R.S.A. 1311-A only after first being arrested and charged with an OUI offense, the petitioner asseverates that this fact is a telltale indication of punitive intent. This asseveration, which rests in large part upon a misreading of the Court's opinion in Department of Revenue v. Kurth Ranch, 114 S. ______________________ ___________ Ct. 1937 (1994), does not withstand scrutiny. The petitioner contends that, under Kurth Ranch, a ___________ civil sanction predicated in terms on a prior arrest is necessarily punitive. But the Kurth Ranch Court examined ____________ numerous factors (including the provenance of the legislation at 9 issue, the extent of the sanction, and the relation between the sanction and the criminal law, see id. at 1946-47) without ___ ___ attaching talismanic significance to any one of them. To the contrary, Kurth Ranch makes it pellucid that these factors serve ___________ as harbingers which, when aggregated, will cast a sanction in either a remedial or a punitive light. See id. at 1947. In this ___ ___ case, given the legitimate remedial purpose that the license suspension proviso serves, we do not find the nexus between an individual's arrest and the imposition of the sanction to be of overriding importance. See Stoller, ___ F.3d at ___ [slip op. at ___ _______ 21] ("Because our interest is in deterrating the overall nature of the sanction, no one factor, standing alone, is likely to be determinative."). In a related vein, the petitioner contends that the legislature's inclusion of the license suspension proviso in a broader bill that mandated several changes in the criminal law portends a punitive intent. The contention is nothing more than a makeweight. Legislatures routinely combine punitive and remedial measures in a single piece of legislation, see, e.g., ___ ____ id. at ___ [slip op. at 25-26], and that unremarkable fact, ___ without more, tells a court very little about the intrinsic nature of a particular administrative sanction. The petitioner's parting structural shot targets the link that the statutory scheme forges between administrative license suspensions and court-ordered license suspensions imposed as part of convicted OUI defendants' criminal sentences. If a 10 defendant is found guilty on an OUI charge, the court not only must impose a suspension identical to that imposed administratively following the initial arrest, see 29 M.R.S.A.  ___ 1311-A(5)(B),5 but also must give the defendant credit for the full elapsed period of the administrative suspension, see id.  ___ ___ 1311-A(5)(C). This interleaving, the petitioner suggests, signifies that the civil sanction must itself be punitive. We do not accept this syllogism. A remedial sanction is not transmogrified into a punishment simply because a similar sanction sometimes may be imposed as part of a criminal sentence. See Hicks ex rel. Feiock v. Feiock, 485 U.S. 624, 631, 636 (1988) ___ ____________________ ______ (explaining that the characterization of a sanction as remedial or punitive depends on the nature of the sanction itself, not the proceeding in which it is imposed); United States v. Salerno, 481 _____________ _______ U.S. 739, 746-47 (1987) (holding that, although imprisonment is generally thought to be the paradigmatic form of punishment, pretrial detention to protect the public is not regarded as punitive). In all events, the credit provision, fairly read, buttresses the State's position on appeal. If a driver is convicted of OUI, the credit provision effectively merges the administrative sanction and the subsequent court-ordered suspension, thereby ensuring that the "punishment" is not  ____________________ 5There is an exception to this identicality that involves persons arrested for OUI while accompanied by minors under the age of sixteen. See 29 M.R.S.A. 1311-A(5)(B-1) (providing for ___ an additional administrative suspension in such cases). The exception is not implicated here. 11 "multiple"; and if a driver is acquitted, there will be no court- ordered suspension and, hence, no possibility of multiple punishment. Either way the credit provision deflates the petitioner's double jeopardy challenge by guaranteeing that no more than a single punishment can be imposed. At the same time, the insertion of this feature bears witness to the legislature's apparent desire to avoid any significant punitive impact while striving to protect the motoring public. For these reasons, we conclude that the architecture of the statute tilts in the same direction as the text. Both are indicative of an intent to serve remedial ends. C. C. __ The petitioner insists that state legislators intended the license suspension proviso to punish drunk drivers, and that this intention demonstrates the proviso's true character. We acknowledge that the legislative history of a statute can be telling in a close case. Here, however, the case is not close and, at any rate, the legislative history does no more than confirm what the language and structure of the statute already suggest.6  ____________________ 6We undertake independent review of the legislative history, mindful that federal courts must make their own constitutional assessments. See, e.g., Siegfriedt v. Fair, 982 F.2d 14, 16 (1st ___ ____ __________ ____ Cir. 1992). Nevertheless, while we do not defer to the Law Court's determination that the Maine legislature set out to fashion a remedy, not a punishment, see Savard, 659 A.2d at 1268, ___ ______ a strong argument can be made that a federal court should hesitate before disavowing a state supreme court's exposition of the purposes animating a state statute. See, e.g., Hamm v. ___ ____ ____ Latessa, 72 F.3d 947, 954 (1st Cir. 1995) (reaffirming the _______ general proposition that federal courts must defer to a state 12 The petitioner's proffer consists of a few snippets culled from the legislative record. As a general matter, courts must be chary of overvaluing isolated comments by individual solons. See Rhode Island v. Narragansett Indian Tribe, 19 F.3d ___ _____________ _________________________ 685, 699 (1st Cir.), cert. denied, 115 S. Ct. 298 (1994). _____ ______ Moreover, most of the comments collected by the petitioner are attributable to opponents of the measure. Statements of legislators who oppose a bill ordinarily add little to the explication of legislative intent, see Selective Serv. Sys. v. ___ _____________________ Minnesota Public Interest Research Group, 468 U.S. 841, 855 n.15 ________________________________________ (1984), and such is the case here. Brushing aside the parsley, the meat of the petitioner's entire proffer comprises only two comments. See ___ Legislative Record House, L.D. 1749, at 1240 (June 10, 1983) ("I don't deny that . . . [suspension] is a very strict and severe punishment") (statement of Rep. Hayden); id. at 1245 ("It ___ is time to suspend those who are playing for time through this court system under the present law.") (statement of Rep. Smith). These blemishes are insufficient to alter the complexion of the challenged statute. A reading of the entire debate regarding the ______ desirability of immediate license suspensions leaves no doubt but that the Maine legislature meant the statute to serve a remedial end. One of the bill's principal sponsors advocated its passage on the ground that an OUI arrest, whether or not  ____________________ supreme court's interpretation of a statute of the state). 13 sufficient for conviction, indicated a likelihood that a person was in the habit of drinking and driving, and therefore posed a threat to others. See id. at 1240 (statement of Rep. Hayden). ___ ___ Other proponents of the bill urged its passage to satisfy the legislature's "grave obligation to remove th[e] drunken driver from the road," id. at 1242 (statement of Rep. Joyce), and to ___ insulate the populace from harm at the hands of individuals who, having been "picked up for drunken driving . . . keep on driving afterwards awaiting trial," id. at 1241 (statement of Rep. ___ Smith). The debate in the state senate proceeded along similar lines. See Legislative Record Senate, L.D. 1749, at 1318-20 ___ (June 15, 1983). In the face of statements such as these, the random remarks singled out by the petitioner constitute too fragile a foundation on which to build a credible argument that the license suspension proviso was designed to punish offenders. See, e.g., Bae, 44 F.3d at 494 (concluding that isolated ___ ____ ___ references to individual legislators' deterrent aims will not indelibly mark a sanction as punitive). The petitioner strives to reinforce his tenuous argument by touting a letter submitted to the chairs of the House and Senate judiciary committees by the Governor's Highway Safety Representative. Allen emphasizes the letter's suggestion "that this bill would be an added deterrent if a person knew that they [sic] would be suspended within the short period of time proposed rather than some unknown date in the unforeseeable future." Letter from Albert L. Godfrey, Sr., April 15, 1983, at 2. But in 14 the very next sentence, the author writes that the bill is needed "[i]n the interests of highway safety." Hence, we discount the letter for two reasons. First, there is no plausible basis for imputing the views of the Executive Branch to the Legislative Branch. See Northern Colo. Water Conservancy Dist. v. FERC, 730 ___ ______________________________________ ____ F.2d 1509, 1519 (D.C. Cir. 1984) (according little weight to an administrator's statement to a congressional committee). Second, the blend of concerns evinced in the letter renders it ambiguous and divests it of any dispositive effect. See Bae, 44 F.3d at ___ ___ 494 (explaining that legislative history reflecting both deterrent and remedial concerns neither requires nor prevents a finding that a sanction is punitive); cf. Stowell v. Secretary of ___ _______ ____________ HHS, 3 F.3d 539, 542-43 (1st Cir. 1993) (explaining that "an ___ ambiguous statute cannot be demystified by resort to equally ambiguous legislative history"). We add an eschatocol of sorts. Even if we were prone to give the Godfrey letter more weight, it would not tip the balance. When applying the totality-of-the-circumstances test to a civil sanction, the fact that the sanction may be aimed partially at deterrence is merely one factor to be taken into account in the decisional calculus. See Bae, 44 F.3d at 494 ___ ___ (explaining that "a deterrent purpose does not automatically mark a civil sanction as a form of punishment"). That factor may militate in favor of a finding of punitive intent, but it is not, by itself, determinative. See Kurth Ranch, 114 S. Ct. at 1947; ___ ___________ Stoller, ___ F.3d at ___ [slip op. at 19]. _______ 15 We conclude that the legislative archives, overall, support the suggestion that the license suspension proviso, 29 M.R.S.A. 1311-A, is intended primarily to achieve a remedial goal. IV IV In the final analysis, the force of a double jeopardy claim depends upon the particular circumstances of each individual case. See United States v. Halper, 490 U.S. 435, 448 ___ _____________ ______ (1989) (mandating "a particularized assessment of the penalty imposed and the purposes the penalty may fairly be said to serve"); Stoller, ___ F.3d at ___ [slip op. at 26] (similar). _______ The pivotal question is whether the sanction, as applied, exacts rough remedial justice.7 See Halper, 490 U.S. at 446. ___ ______ Evaluated from this standpoint, we believe that the administrative sanction Maine imposed on the petitioner passes muster. In purpose and effect, the ninety-day license suspension can fairly be viewed as remedial inasmuch as it is rationally related to the apprehended danger and the potential harm. That is, the State could reasonably conclude from the petitioner's OUI arrest alone that preservation of public safety warranted a  ____________________ 7The State disagrees, proposing that we examine instead the universe of license suspensions in order to determine whether the temporary loss of driving privileges is, in the abstract, a punishment. We reject this approach. Unlike the State, we do not believe that the Court's opinion in Austin v. United States, ______ _____________ 113 S. Ct. 2801 (1993), changed settled law in this regard. There the Court held that, because of the peculiar nature of the forfeiture implicated by Austin's appeal, that forfeiture should be examined in general and not merely as applied. See id. at ___ ___ 2812 n.14. We believe that this special approach is best limited to certain civil forfeitures. It has no applicability here. 16 breathing spell (in the form of a temporary ninety-day cancellation of driving privileges). The petitioner protests that the Secretary neither undertook an individualized determination of his dangerousness nor offered him a chance to show that he had rehabilitated himself prior to the end of the suspension period. These allegations are true but neither fact undermines the conclusion that the license suspension is essentially remedial. For one thing, the ninety-day suspension is subject to relaxation should the petitioner apply for a work-restricted license. See 29 ___ M.R.S.A. 1311-A(5-A). Limitations of this ilk are typical of remedial suspension provisions. See, e.g., Butler v. Department ___ ____ ______ __________ of Pub. Safety & Corrections, 609 So.2d 790, 797 (La. 1992). For ____________________________ another thing, the Secretary's order is limited temporally and the period of suspension in Allen's case, ninety days is reasonable in relation to the future harm the offender's conduct might portend. In other contexts, the courts have found debarments of fixed duration, based on prior misconduct, aimed at protecting the public from possible future shenanigans, to be nonpunitive. See, e,g., Manocchio v. Kusserow, 961 F.2d 1539, ___ ____ _________ ________ 1542 (11th Cir. 1992) (finding remedial an order banning a doctor from participating in Medicare for at least five years); United ______ States v. Bizzell, 921 F.2d 263, 267 (10th Cir. 1990) (discerning ______ _______ no punitive intent undergirding a two-year ban from accepting government contracts). Such durationally rigid restrictions, although they may bear the sting of punishment from the 17 recipient's perspective, plainly serve the government's prophylactic interest. See Stoller, ___ F.3d at ___ [slip op. at ___ _______ 28].  We need go no further. The key to cases of this genre is to "distinguish carefully between those sanctions that constitute impermissible exercises of the government's power to punish and those that constitute permissible exercises of the government's remedial authority (even if effectuating a specific remedy sometimes carries with it an unavoidable component of deterrence or retribution)." Stoller, ___ F.3d at ___ [slip op. _______ at 30-31]. After analyzing the totality of the circumstances, we conclude that the civil sanction at issue here the suspension of the petitioner's driving privileges ordered administratively by the Secretary represents a reasonable effort to protect the public from motorists who have demonstrated a dangerous propensity to drink before they drive. The sanction therefore is principally in service to a remedial goal. Because the license suspension does not constitute a punishment under appropriate double jeopardy analysis, the district court did not err in refusing to issue a writ of habeas corpus. Affirmed. Affirmed. ________ 18